STRANCH, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. CLAY, J. (pp. 642-44), delivered a separate dissenting opinion.
OPINION
STRANCH, Circuit Judge.
We like to think that Poor Richard was right about honesty. See Farrington v. State of Tennessee, 95 U.S. 679, 682, 24 L.Ed. 558 (1877) (“The trite old aphorism that ‘honesty is the best policy,’ is true alike of individuals and communities. It is vital to the highest welfare.”). Unfortunately, it seems, some interpretations of our immigration laws encourage dishonesty and punish those who do not take the hint. This can be true for the asylum seeker who has uttered a falsehood in order to be allowed to live or work in this country — admitting the falsehood can make him ineligible for cancellation of removal because he cannot establish “good moral character.” But not always — because the law also recognizes the doctrine of retraction. A he may “stand[ ] on one leg, truth on two.” Benjamin Franklin, Poor Richard’s Almanack, ¶ 21 (U.S.C. Publ’g Co.1914) (1735). The doctrine of retraction preserves the balancing grace of honesty by acknowledging that timely retraction of the he lifts the bar of ineligibility and provides the opportunity to establish qualification for cancellation of removal. Here, we address a decision by the Board of Immigration Appeals that, if upheld, would disturb that delicate balance.
*638 Mario Ederrilso Ruiz-Del-Cid filed an application for asylum in 1993 and was interviewed by an asylum officer in 2007. After the asylum officer denied his application, the Department of Homeland Security initiated removal proceedings against Ruiz and his wife, who was also in the country illegally. The couple applied to cancel their impending removal. The Department of Homeland Security contested their application and, in 2011, they appeared before an Immigration Judge.
Upon taking the stand, on direct examination by his own lawyer, Ruiz voluntarily confessed that his asylum application contained an untrue statement and that he repeated the lie at his 2007 asylum interview. He testified that a notary public had written his 1993 application for him because Ruiz could not read or write English at the time. Ruiz learned only after he submitted the application that the notary had written that Ruiz had been threatened by guerillas in Guatemala. In fact he had not.
Near the end of the hearing, the immigration judge asked, “[W]hy did you tell that to the Asylum Officer?” Ruiz replied:
Perhaps because I didn’t have the advice of an attorney and I made a comment with the same people, with the same people who have the same case as mine. And they told me you have to sustain what you said in the application because if you don’t, you are going to be, your work permit is going to be revoked and you are going to be deported. And to tell you the truth, from my working permits depends my life hood and my family’s life hood. I to tell the truth, I have this deep inside of me in my heart that I swear over the Bible to tell the truth and I didn’t.
A.R. 183. Ruiz’s lawyer explained why he had recanted:
Once [Ruiz] advised me that the information was not correct, we came to a decision that obviously if it’s not correct, we cannot go forward with it even if it’s going to hurt him, we can’t go forward with it. And in fact, we have to actually withdraw it and let the Judge know why it has been withdrawn. It’s not an easy choice to make. Obviously the lead respondent is and was very concerned about that because he knows that he made a mistake in April of 2007 [at the interview] as well as in June of 1993 [on his application].
A.R. 280. No government action preceded the retraction and the government’s lawyer told the immigration judge, “I really was not expecting this.” A.R. 263.
The government’s surprise was understandable: Mr. Ruiz had just voluntarily (and perhaps fatally) harmed his case for cancellation of removal. The government may only cancel removal if the applicant “has been a person of good moral character” during his time in the United States. 8 U.S.C. § 1229b(b)(l)(B). The problem for Ruiz is that “[n]o person shall be regarded as, or found to be, a person of good moral character,” 8 U.S.C. § 1101(f), if he “has given false testimony for the purpose of obtaining any benefits under this chapter,” including asylum, § 1101(f)(6). Mr. Ruiz’s statements during his 2007 interview constitute “false testimony” for the purposes of section 1101(f). See Medina v. Gonzales, 404 F.3d 628, 635-37 (2d Cir.2005); Matter of M-, 9 I. & N. Dec. 118, 119 (BIA 1960); In re R-S-J, 22 I. & N. Dec. 863, 865 (BIA 1999).
There is a longstanding exception to this rule, however: the doctrine of retraction. “[W]here an alien in an immigration proceeding testifies falsely under oath as to a material fact but voluntarily and without prior exposure of his false testimony comes forward and corrects his testimo *639 ny, perjury has not been committed and the charge based thereon is not sustained.” Matter of M-, 9 I. & N. Dec. at 119; see also Matter of Namio, 14 I. & N. Dec. 412, 414 (BIA 1973). The few published decisions of the Board of Immigration Appeals that address the doctrine in the context of the Immigration and Nationality Act explain that a retraction must be “voluntary” and “timely” (which the decisions also characterize as “without delay”). See Matter of M-, 9 I. & N. Dec. at 119; Matter of Namio, 14 I. & N. Dec. at 414.
The immigration judge in this case did not consider whether Ruiz had timely retracted his prior testimony. Instead, the judge found a “clear violation” of Section 101(f)(6). Although the judge believed that Ruiz had shown an honest remorse for his earlier false testimony, he held that the current remorse did not purge Ruiz from his prior false testimony. Accordingly, the judge concluded, Ruiz was “statutorily barred” from being determined to be a person of good moral character.
Ruiz appealed the ruling to the BIA, arguing that his retraction had been both voluntarily and timely. Stating that “recantation must be timely and without delay,” the BIA, in a single-member decision, concluded that the retraction exception did not apply because it was not timely. “The respondent may have been able to benefit from this doctrine had he recanted his statements in his asylum application at the time of his asylum interview, but here he waited until he was called to appear in Immigration Court seeking other relief,” the BIA wrote. “The respondent delayed retraction of his false testimony before the asylum officer for 4 years” and may not benefit from the doctrine of recantation.
We review the BIA’s resolution of a question of law de novo but, pursuant to the rule of Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), will defer to its construction of an ambiguous statutory provision within its jurisdiction unless that construction is “arbitrary, capricious, or manifestly contrary to the statute.” Sad v. INS, 246 F.3d 811, 815 (6th Cir.2001) (quoting Chevron, 467 U.S. at 844, 104 S.Ct. 2778). We afford less deference to constructions promulgated in the BIA’s nonprecedential single-member decisions. See, e.g., Martinez v. Holder, 740 F.3d 902, 909-10 (4th Cir.2014); see also Japarkulova v. Holder, 615 F.3d 696, 700-01 (6th Cir.2010). Although still entitled to respect, “[t]he weight of such a judgment” in an unpublished single-member decision “will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with early and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.” Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). The BIA’s factual findings “are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4); Khalili v. Holder, 557 F.3d 429, 435 (6th Cir.2009). If the BIA has failed to adequately explain its reasoning, “[t]he reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency’s action that the agency itself has not given.’ ” Motor Vehicle Mfrs. Ass’n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947)).
The facts are not in dispute. The question here is whether Ruiz’s voluntary confession qualifies under the doctrine of retraction — a question which turns on whether he timely retracted his false testimony.
*640 The BIA has defined timeliness as a question of whether the petitioner retracted her false statement before its falsity had been or was about to be exposed. See, e.g., Matter of M-, 9 I. & N. Dec. at 119 (alien’s retraction made “without delay” if he “voluntarily and without prior exposure comes forward and corrects his testimony”); In re: Irene Chelagat Cheruiyot, A95 204 157, 2007 WL 2074420, at *2 (BIA June 15, 2007); In re: Francisco Saez-Sosa, A71 899 535, 2007 WL 1125707, at *1 (BIA Feb. 23, 2007); In re: Jose Valadez-Munoz, A75 219 367, 2006 WL 1558823 at *2 (BIA Apr. 12, 2006); see also In re: Serafín Alejandro Mendoza Lara, A079 376 389, 2010 WL 4971051, at *1 (BIA May 20, 2010) (apparently equating timeliness with retraction “without pri- or exposure of ... false testimony”); Costa v. Att’y Gen. of the U.S., 257 Fed.Appx. 543, 546 (3d Cir.2007) (retraction made almost two years later permissible “because he corrected [the false statements] voluntarily and prior to any exposure by the government.”). Moreover, “the length of time between a misrepresentation and the claimed retraction of it is not determinative of its timeliness.” In re: Kalombo Kalonji A098 926 168, 2010 WL 673495, at *1 (BIA Jan. 26, 2010). Rather, “the BIA has repeatedly held that 8 U.S.C. § 1101(f)(6) does not bar a person from establishing good moral character when he has Voluntarily and prior to any exposure of the attempted fraud corrected his testimony.’ ” Costa, 257 Fed.Appx. at 546 (quoting Matter of M-, 9 I. & N. Dec. at 119). The inquiry thus focuses on the underlying statutory concept of good moral character by distinguishing between those applicants who retract false testimony when it is clear that impending revelation of the lie by others will expose them and those applicants who voluntarily confess and retract at the next appropriate opportunity. This approach is certainly consistent with the purpose of section 1101(f)(6), which, the Supreme Court has explained, is “to identify lack of good moral character.” Kungys v. United States, 485 U.S. 759, 780, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988).
Some decisions appear to consider the time between the false statement and the retraction as a relevant, but non-disposi-tive factor in determining timeliness — but only where there was also an imminent risk of exposure. See, e.g., Matter of Namio, 14 I. & N. Dec. at 414 (retraction not timely when one year had passed and exposure was imminent); Matter of Ngan, 10 I. & N. Dec. 725, 729 (BIA 1964) (retraction not timely when made “some three and half years later ... and after investigation disclosed evidence that the respondent was not in fact the person he claimed to be”); Valadez-Munoz v. Holder, 623 F.3d 1304, 1310 (9th Cir.2010) (concluding that where applicant did not recant until six years after his false statements when it was clear that the “false representations would not succeed in getting him admitted into the country” the applicant “could not take advantage of the timely recantation doctrine.”); cf. Jian Kang Zheng v. Attorney Gen. of U.S., 264 Fed.Appx. 228, 230 (3d Cir.2008) (finding that substantial evidence supported the IJ’s determination that the applicant’s retraction three years after his false statements was not timely where the IJ had warned the applicant at the beginning of the hearing about the consequences of filing a frivolous application.). And where there is no risk of exposure, some decisions use the close connection in time between the false statement and the retraction to support a finding that the statement was not an intentional misrepresentation. See In re: Paula Garcia, A77 999 886, 2006 WL 448342, at *2 (BIA Jan. 19, 2006) (“The fact that she very shortly thereafter answered the question *641 in the affirmative renders her mistaken report and its subsequent correction one inseparable incident out of which intention to deceive cannot be drawn”).
Unfortunately, the BIA’s retraction doctrine is sometimes misunderstood. A decided minority of cases assume without analysis that retraction must occur very shortly after the false statement is made for it to be timely. See, e.g., Aoko v. Holder, 518 Fed.Appx. 169, 177 (4th Cir.2013) (agreeing with the IJ that “a timely withdrawal would have come ‘very shortly after she had knowledge of the misrepresentation’ ” where the IJ also found that the applicant’s testimony from the hearing where she retracted was not credible). However, these cases depart from the consistent rule that a retraction is untimely only when it “is made in response to the actual or imminent exposure of the misrepresentation.” In re: Kalombo Kalonji, 2010 WL 673495, at *1.
To recap: The issue addressed by the BIA is the statutory requirement that an applicant must be a person of “good moral character” to merit cancellation of removal, 8 U.S.C. § 1229b(b)(l)(B), as defined by the false testimony exclusion under 8 U.S.C. § 1101(f)(6). See Kungys, 485 U.S. at 782, 108 S.Ct. 1537 (“Section 1101(f)(6) ... is part of a definition of what constitutes a lack of ‘good moral character’ for purposes of qualifying for immigration.”). According to the BIA’s longstanding interpretation of those provisions, applicants who gave false testimony but corrected their testimony voluntarily and prior to exposure or threat of imminent exposure may still be persons of good moral character. See, e.g., Matter of M-, 9 I. & N. Dec. at 119; see also Costa, 257 Fed.Appx. at 546. If there is no immediate risk of exposure, the amount of time between the false statement and the retraction is not determinative of an applicant’s qualification for the exception. See In re: Kalombo Kalonji 2010 WL 673495, at *1; Matter of M-, 9 I. & N. Dec. at 119. This standard rightly places the IJ’s and BIA’s focus on the statutory requirement of good moral character, an issue for which the length of time between the statement and its retraction provides little information, particularly in light of the longer timeframes attendant to immigration enforcement. See Matter of M-, 9 I. & N. Dec. at 119.
The BIA’s decision at issue here, with precious little explanation, concludes Ruiz could not benefit from the retraction exception because he had “delayed retraction of his false testimony before the asylum officer for 4 years.” Perhaps the BIA thought four years to be so long that it saw no need to explain why. But in fact, its conclusion was incorrect under its own correct statement of the governing standard — that timeliness is determined by asking whether the false statement was retracted before it had been or was about to be exposed. Ruiz chose, to his own detriment, to retract his statement at the first opportunity he had to testify after his interview and where there is no evidence that his lie would ever have been exposed. It is no secret that the immigration system moves very slowly; Ruiz should not be prejudiced by the BIA’s own backlog. Here, the BIA’s interpretation of the retraction doctrine, although perhaps not “manifestly contrary to the statute,” was at variance with its own binding precedent and cannot stand. See Valdiviezo-Galdamez v. Att’y Gen. of the U.S., 663 F.3d 582, 605 (3d Cir.2011); see also Idaho Power Co. v. FERC, 312 F.3d 454, 464 (D.C.Cir.2002).
We cannot, however, determine eligibility for cancellation of removal under the four elements of 8 U.S.C. § 1229b(b)(l)(A)-(D). The IJ found that Ruiz had satisfied *642 the physical presence requirement of (A) and had not been convicted of a disqualifying offense under (C). He found that Mr. Ruiz’s wife satisfied the hardship requirements of (D) but made no determination of that issue for Mr. Ruiz. The proper course, therefore, is to remand to the BIA so that the board can determine whether Mr. Ruiz satisfies the hardship clause and is thus eligible for cancellation of removal. See Costa, 257 Fed.Appx. at 547.
We therefore VACATE the decision of the Board of Immigration Appeals and REMAND to the Board for further proceedings consistent with this opinion.